Good morning, and we're resuming our session from this morning. Judge Kristen and I are pleased to welcome Judge Morris from the District Court in Montana. Thank you for joining us to help us out here. We have several cases submitted on the briefs. The first case is Evangelina Palomino Espinoza v. Barr is submitted. United States of America v. Larry Ochoa is submitted. Leslie Gunn v. Hans Peter Wild is submitted. And the first case for argument is Victor Perez v. James Cox. Good morning, Your Honors. Heidi Stern on behalf of Appellants. The death of Carlos Perez is a tragedy. There's no dispute about that here in this court today. And as the case continues in District Court, and the prosecution of Officer Ramos continues in State Court, the State of Nevada and the officers responsible for what happened here will have to answer for the acts that they were responsible for. But we believe it's important that this case proceed against the correct defendants. And given the allegations in the amended complaint, former Director Cox, Warden Nevin, Assistant Warden Filson, and Lieutenant Oliver are simply not responsible for what happened to Carlos Perez on that day, and they should be dismissed from this action. The problem with the amended complaint in this case is that it pleads only conclusions against the supervisory defendants. The written policies of NDOC, the Nevada Department of Corrections, as well as High Desert State Prison, are not really at issue here. The District Court did not find that there was an unconstitutional policy, and as written, those policies do not violate the Constitution. The District Court instead relied on the conclusory allegation that there was an unwritten custom at High Desert State Prison to deploy deadly force where it was not required, and to needlessly shoot inmates with shotguns. However, aside from that conclusory allegation, there are no factual allegations to undergird that allegation. I would ask this Court to contrast this case, for example, with Starby Baca and with the Rodriguez case, in which there were underlying factual allegations that those jails, in that case, actually had a custom, repeated instances of abuse of prisoners. Are you saying there's no allegation that there was a different practice? Just to clarify, Your Honor, a different practice? Apart from the written policy. I would contest that. However, I don't think this Court needs to decide that here today. I think that can be determined later. It has to be determined later, under our standards, right? Yes, yes. So what is your position exactly as far as the practice goes? Here's the problem. There's a difference between the allegation made here and the actual practice of the prison. We're not going to make the factual finding here, so now you've lost me. Well, I'm just, I guess I'm referring to the ASCA report, which the district court did decide it was going to take judicial notice of. So let me ask you about that report. I was a little confused, because that report was promulgated after the events at issue here. That's correct. Is there any other allegations of information that would have been available to the prison before the ASCA report was published that would put them on notice about the use of Buckshot? I'm not sure that ASCA said you shouldn't use it, but it certainly identified some dangers associated with it. The written policies do permit the use of Birdshot, not currently, but at the time that this occurred. So the written policies did say that one of the options available to maintain order and safety at High Desert State Prison was to skip shot the Birdshot, which is heading towards the ground. But what's the implications of the ASCA report coming out after the events at issue here? So my question is whether, obviously a report that comes out after the events isn't something that would put on notice the people at the prison. So it can't be relied on for letting them know that this was a dangerous practice. No, certainly the report cannot be used for that. So what is it that puts the people on notice that it's a dangerous practice? There is nothing. Well, the report talks about – I mean, I just want to make good use of your time, and you know opposing counsel is going to get up and say that the report talks about a longitudinal history of the use of – that this happened often, happened frequently, and there were quite a number of injuries. So what is your response to that? Yeah, so I'll address that. It did happen frequently. However, if you look at the ASCA report at page 46, it says that the number of incidences where a shotgun was actually used is not abnormal, considering the mission of High Desert State Prison. So High Desert State Prison is the intake facility for Nevada. That, as the ASCA report explains, makes it a more volatile prison situation. It's also not super max security the way that Ely State Prison is, and so the prisoners have more freedom. And so that results in the need to use – the need to resort to the use of guns occasionally. However, I would also point out that there were 48 incidences of shotgun use over the course of three years. So that's just a bit over an average of one per month. Now, if you consider that High Desert State Prison is also by far Nevada's largest prison with approximately 4,000-plus inmates, it puts that into perspective as to how often that really was, and that's why the ASCA report concluded that this use of shotguns was not abnormal. Well, what does it say about the use of shotguns as a methodology at all nationwide? What does it say about whether that is aberrational? Yeah. So the ASCA report does conclude that it's not a best practice. However, it also concludes, based upon an unpublished decision of this Court, which I understand is not precedential, but it concludes that it was found to be not unconstitutional. But that was a very different factual situation. Sure. And the Ninth Circuit said the district court didn't clearly err. That was a fistfight going on. This is two guys in shower slippers with handcuffs behind their back, and the first resort is to a birdshot to the chest. I absolutely agree. The circumstance that occurred here – But are you suggesting that this incident was an aberration? I mean, it seems like – Yes. Yes. I'm suggesting absolutely. We jumped over the warning shot, the skip shot, and went straight to the birdshot to the chest. There was a warning shot, but, you know, that doesn't excuse it. I'm not saying it does. Can I get you to clarify your response to Judge Morris's question? Is it your response that the outcome was aberrational, or that the resorting to the use of birdshot was aberrational? It's my – it's a little more specific than that, which is the use of birdshot is not unconstitutional. However, this – I'm asking – my word was aberrational. So just to be clear. This incident was aberrational in the sense that he shot at his chest. He didn't skip shot. So had he shot – had he followed the policy and shot at his feet at the skip shot directions, your position is it would not be aberrational. It would have been consistent with the policy to – Assuming other facts like, you know, that's a pretty factual determination, I think, because in general I would say yes, assuming that the warning shot was taken, the verbal warning was taken, those kind of things. But we're not talking about Mr. Ramos. He's not before us. We're talking about the supervisors. That's correct. I'm not exactly sure what formulation we've had for supervisory liability, but they would have to have the mens rea and have caused, said in motion, a sequence of events that led to Mr. Cox being – Mr. Perez being shot in the chest. And so that requires them to know that this is a problem. So are there allegations that would provide information that the use of buckshot at the prison had resulted frequently in deaths or serious injuries of this sort? No, there's absolutely not. And that distinguishes this case, like I said, from this Court's prior precedents. When was the prisoner blinded? When did that happen, before or after this incident? You know, Your Honor, I'm not sure. I think it was around – it was a similar timeframe, but I don't know. Okay. And then just to follow up on Judge Okuda's question, were there other – is it the State's position there haven't been any other serious injuries? As far as I know, I'm not aware of any, nor am I aware of – I mean, there certainly are injuries, but something like this, a fatality, absolutely not. Right. So I was trying to be – maybe I wasn't clear, but that's why I asked about the blinding, if there have not been other – but maybe you've answered that you don't know either way. As far as I know, there have not been, no. That's the only one that I'm aware of. So if there were, however, those situations, we would expect the complaint to contain some type of factual allegation to undergird their general allegation that there was somehow this custom. You can't have a custom if you don't have prior incidences of something like this happening or people being endangered. You just said it happens about once a month or that that had been the track record. That's just the use of guns. Right. That's what we're talking about. Forgive me. What am I missing? I was talking about – Oh, the shooting at the chest. Injuries. Yeah, the actual custom of using deadly force. See, that's the problem with the complaint. In fact, I think your confusion – I also had the same confusion because if you look at the complaint and you look at the district court's order, that's the error it made. It basically finds that, well, there's this conclusory allegation that the High Desert State Prison is using deadly force unnecessarily in a case where there's no need. However, factually speaking – Counsel, you're firing shotguns in a confined space. I mean, whether you're aiming at the ground or wherever, aren't you potentially using deadly force? Based upon the previous experience of the prison system, it's not considered deadly force because it is not likely to end up in serious injury or death. The use of buckshot, by contrast, is considered deadly force. This is difficult for me because the report that comes out – I think Judge Okuda is exactly right. It comes out after the fact, but it certainly takes issue with this. And in terms of best practices, and we're talking about defendants, that your position I think is these folks are entitled to qualified immunity. And yet, if you're in the business of establishing this kind of policy for a state prison or for any kind of a prison, it seems to me those are exactly the folks who are supposed to be charged with adopting practices that are accepted within that profession. And so that's why that report – I just want to give you an opportunity to respond. It seems to me that that's why that report is meaningful and was meaningful to the district court. So the supervisory defendants here did adopt a policy, and that's alleged in the complaint. It's the written policy. The written policy that allows shotguns to be used in a certain way at the prison. Kagan. I understand that, and your time is ticking. So just to be clear, what I'm trying to – my understanding is that the written report that came out afterwards does take issue with the written policy and says it's not best practices and that it's concerning. Did I misunderstand that?  It says that. It just doesn't say that it's unconstitutional. And also I'll point out that on page 53 of that ASCA report, it makes recommendations to the prison system of Nevada, and stopping the use of birdshot entirely is towards the bottom of that list. And I think the reason for that is the ASCA report recognizes that these supervisors have a responsibility to maintain order. They owe a duty of protection not just to inmates but to the officers who are on the ground, to any visitors to the prison, and that they have to resort to some type of disciplinary measures. And so the ASCA report doesn't suggest – But, Counsel, isn't the use of birdshot just a way to avoid having to hire more staff? Because I've got a shotgun with birdshot. I can do the job with three staff. I can assure you that the Nevada Department of Corrections does not want to avoid hiring more staff. They would love nothing more than to hire more staff because that – Well, I'm sure they would, but does the Nevada legislature want to cooperate? That's a separate problem. Yeah, that is a separate problem. And I think the ASCA report takes that into consideration. You have to look at the supervisor's position that they're in specific to the circumstances that actually exist on the ground. But you don't have – I'll say again, you don't have the type of custom and abuses that were alleged in Starby Baca, that were alleged in Rodriguez, where it was also caused a bit by overcrowding. But in those cases, the supervisors really did know that there was a custom and practice of abusing prisoners, and they did nothing to stop it. And, in fact, in the Rodriguez case, it was found they encouraged it. That's not the case here. Do you want to save some time for rebuttal? I will. Thank you. All right. Good morning, Your Honors. My name is Paola Armeni, and I represent the Perez family. Your Honors, we are asking that today you affirm the district court's decision where he partially denied the motion to dismiss. Hitting on some of the topics this Court has already picked up on, let me start with I think the last question you asked my opposing counsel, was with the recommendation. She stated that the recommendation was to stop using the birdshot. However, other things had to be done first. Well, other things had to be done first because they don't have other mechanisms in place. I think a baton was one of the things they suggested. They said before we tell you to get rid of the birdshot completely, you need to put some other things in place such as different mechanisms of use of force as well as more staff. But the overall recommendation was this policy was archaic. I believe Nevada Department of Corrections is the only Department of Corrections in the country that was still utilizing this mechanism as a use of force. Can I ask a question about the scene? I'm sorry, the scene? Yes. It's a little hard to tell from the record. The record tells me that what happened. I understand the passing, coming out of the showers, all of that, and there were two guards on the floor, both of whom have resigned. And it says that they, after the one warning shot was fired, that Ramos was in what they call the bubble, and that the two hollered to him to then shoot additionally. But what I don't know is whether or not that person, Ramos, was in a, was the bubble a raised platform? Is it higher? That's my understanding, Your Honor, is there's an office, and this is coming strictly from Mr. Kastner's letter, is there was an office underneath, and on the second floor there was this bubble. So some place where he can observe and see, presumably. Yes, Your Honor. Okay. So then the next question I have is when there's an allegation of deliberate indifference vis-a-vis Oliver, and when that person showed up, responded, there's an indication that he was speaking to Ramos. I can't tell if he's down on the floor where these two men were injured, laying on the floor, and talking on the radio or something, or was he up in the bubble? Your Honor, I'm not sure I can even answer that question. As the Court knows, we haven't done discovery yet, so I'm not 100 percent sure. Well, it's difficult because it's your allegation that he was deliberately indifferent. I understand. I don't see an allegation. So just so you know where I'm going, then I promise I'll let you respond. Of course. I don't see an allegation about whether or not Oliver, for example, was trained in first aid, much less whether he was close by where he could have delivered any first aid. I don't know if the problem is that he didn't call for 911. I'm really having trouble figuring out how that rises to the level of deliberate indifference. And I believe it's the latter, Your Honor. I believe, based on the information we have, frankly, it's not 100 percent clear on the timing. Different staff members, different medical members have all alleged different times that things occurred. So it's difficult, even when I'm reading it, to surmise whether Oliver, Lieutenant Oliver, got there before the medical staff, which would put this, I think, in a somewhat different scenario. Where, I think, is the question Judge Christian was, I'm sorry, asking. Got where. Is he responding up where Ramos is or is he down by the floor? Because it's hard to understand. It is your allegation. I have to figure out why you think he was deliberately indifferent. Right. I believe he asked somebody to cover Mr. Ramos, Officer Ramos, and had Officer Ramos come down. But he did say in his statement that he witnessed Mr. Perez on the top level bleeding profusely. On the top level? Yes. Mr. Perez was on the top level. On the second floor. Where was the bubble above that? The bubble was on the second floor as well. So they're not calling up to, they're calling over to Ramos to shoot? Yes. Okay. Let me be clear on your, with regard to Lieutenant Oliver, is the allegation that he failed to notify or request medical personnel right away or that he, not that he didn't render medical treatment himself? No, I don't think it would be that render. I think it was to assess the situation, figure out what maybe Mr. Perez needed, if there was additional medical treatment that needed to be had. I think there was a recognition that in prior instances they had called Medic for Life where the helicopter comes in. And so that was something he certainly could have done if he went up and assessed the situation. But let me ask you about this because the complaint says merely that to ensure that Carlos received adequate medical attention, Defendant Oliver spoke with a trainee officer, Defendant Ramos. Are there any other allegations about what Mr. Oliver did or didn't do? Is that the only allegation? That is, Your Honor. Okay. That is. I'd like to address the notice. My colleague said there wasn't any notice. I dispute that. I believe although the report came out after the fact, as the court indicated, these were incidences that were occurring over the years. Did you allege, with any specifics in the complaint, about this unwritten policy of shooting to kill? I mean, obviously they have a written policy of using birdshot for maintaining order, but I don't think I saw in the complaint a policy of shooting at people's chest as a current miscase or shooting to kill or shooting in a way that would intentionally, because I think for an excessive force claim, you have to apply force maliciously and sadistically to cause harm. I didn't see those sorts of allegations. Are they? Did I miss them or should I be reading the allegations that are there in a different way? To your specific fact scenario about the chest, the shot to the chest, you won't find that in the complaint. As to that this force was being used in a deadly manner, I believe that is in there and the district court touched on that in his order. I saw it conclusorially, but not any example. So in other words, we know that the birdshot was used because it's in the written policy and there's no dispute about that. The question is whether it was used in a way not permitted by the policy, as in this case, and there was a custom of encouraging or allowing that. And there I didn't see any examples or any incidents that were indicated. Are they there or not? Well, let me tell you what's in there. What's in there is this idea that the policy allowed for, the policy itself actually allows for a verbal warning directly into birdshot. And it says viral warning shot. And then skipping the shot at the legs is what it says. It does. But I guess I'm using it collectively as the warning shot as part of the birdshot process, as part of that. And then from there, so that happens. Because of the low staffing, what ended up happening was this really ended up being the only type of physical force that was being utilized. This became exclusive. And that's what the report picks up on, that this was exclusive. And the staff members, when the staff were interviewed, they conceded that. They said, yes, this is what we do here. The NDOC had to be aware of it and High Desert had to be aware of it. And it was being used frequently, apparently once a month. But that, I'm not sure, gets you to the malicious and sadistically to cause harm point for an Eighth Amendment excessive force claim. Well, because, Your Honor, they dubbed this as non-deadly force. There's actually a contradiction in between the administrative regulation and the operating procedure. In the administrative regulation for NDOC, they actually identified deadly force as force that kills or substantially injures, which substantially injures is normally a question for a jury. So it wasn't established at the time of the incident that use of birdshot consistent with the policy was deadly force? No, Your Honor. It was not. It was labeled as non-deadly force. However, over the ---- And, in fact, there hadn't been any. Had there been deaths over that three-year period? I thought there was the one incident of blinding. We don't know the date. And then this incident. So was there a history of the use of the birdshot causing deaths before that? I cannot speak to the death based on, because we haven't conducted any discovery. So as I stand before this Court, no, I'm not aware of any other deaths. There are other situations, however, that the Court picked up on, which is the case of Olivias, and that happened on 731.12. That was the blinding of the eye. There was another incident on 4-9 of 2012 where that person was also injured in the eye. There are incidences, and in the report it talks about, unfortunately not specifically, so I have the same information you have, but in that report it specifically talks about multiple people being injured. I can't tell you what that injury is. They've classified it as being injured. So there are multiple instances where this high desert, the officials, the warden, the associate warden should have known. Their own policies and procedures lay out that they're responsible to implement and enforce these policies, that if force is used, if there's a use of force or a weapon is utilized, the associate warden and the warden are notified. So there has to be a reasonable inference here. So for the Eighth Amendment claim, I think Ashcroft v. Iqbal, in our case in Starr, says that the supervisors would have to have the mens rea for the underlying constitutional tort. And so to the extent that's applying force maliciously and sadistically to cause harm, are there allegations that would support that mens rea for the supervisors? Yes, I believe the answer is yes. And what is that? Based on the notice that this birdshot did substantially injure people, yet they still utilized it as a mechanism. So that's the gist, is that we have the two incidents that you reported of blinding. There's the use of birdshot consistent with their policy, and based on that, the supervisors continued the policy of using birdshot with the intent, I guess, to cause harm. Because the policy is... Or at least knowing that it's likely to occur. I'm sorry. Time is ticking. And it just seems to me that the difficulty that I have, so you can respond perhaps to this at the same time, Mr. Jakuda's question, is that in the earlier incidents, one of the people, I think the person who was blinded, wasn't the person they were shooting at. Correct. So there's... Right. So to go back to Judge Morris's question, you're shooting birdshot inside a prison with a lot of hard surfaces and things are pinging around and people are getting hurt, it seems to me the problem. That individual wasn't the person who was disobeying an order. Correct. And frankly, Your Honor, based on the case law that has addressed birdshot, which is very limited, most of the people that have been injured are actually bystanders. Because as the report indicated, this is very... Birdshot is very unpredictable. So when they shoot it, it can go in multiple places. So that alone... But this allegation in the complaint doesn't include Oliver as a defendant, I don't believe. The excessive force does. It does, Your Honor. Under the... More so, I believe, the training, the deliberate indifference for the training and the supervision. So that, well, maybe let me just ask it this way. What are your allegations against Oliver? That he was, because he was a supervisor, he was present, he was aware of the practice that was going on and allowed it to continue on. What paragraph in the complaint? And then you allege, in addition, just so I can complete this, you haven't mentioned, but you allege also that he was deliberately indifferent because he didn't call for medical care or administer medical care. And is that right? Yes. So which is it, that he didn't administer medical care? Was he supposed to do that standing next to the bodies? Or did he not verify that 911 had been called? Or what is it that you're alleging vis-à-vis Oliver, please? So, Your Honor, I didn't write the complaint, but I will take the position that it is the latter. That he didn't call 911? Yes, that he didn't take steps to facilitate medical treatment more quickly. And, again, in candidness, I don't have the timeline of when everybody showed up exactly. Has somebody made the allegation? And I appreciate that this is pre-discovery, but is there one of the interviews where I missed it or the summaries? There are a number in the record. I've read them. I'm happy to re-read them. But is that your allegation, that someone indicated that they somehow observed that he had not verified that 911 had been called? Not that specifically, Your Honor. Okay. Just very general. Did I answer your question, Your Honor? I believe so. Thank you. Thank you. With that, if there are no more questions, I would just ask that you affirm the district court's order. Thank you. Thank you for your argument. I'll just briefly address a couple of things. There's really no dispute. Oh. Yes, Your Honor. Please. Go ahead. There's really no dispute on our side that birdshot can cause harm. The issue here, however, is that these supervisory defendants in making the policies both written and custom at the prison have a choice between maintaining order where more harm could be caused by the actions of the inmates themselves and less harm caused by the officers taking action to stop those type of disturbances. Counsel, the facts of this case rely on that. We've got two guys handcuffed behind their back in shower slippers and shorts floundering around kicking each other. Who's going to get hurt besides the two of them? And you order birdshot. And that demonstrates why what happened in this case is an aberration. The problem with the complaint is that it doesn't actually allege that the supervisors implemented a custom that would allow this type of thing to happen or that would allow the excessive use of deadly force. But it seems to get back to the staffing question. You have this policy, this pitch and catch where, okay, you head back to your cell now from the shower and you bring the other guy down, no one escorting them, and then they get in an altercation. The first thing you do, don't send someone out to grab them. You send the guy up in the booth with the gun to start firing. And, Your Honor, the pitch. Can I just piggyback? And once they're down, once they're on the floor, or it's easy to imagine two prisoners being in an altercation, what does it even mean to say only shoot at their feet with a shotgun, right? You shoot at the ground. Well, you see the problem. It just seems to me to be remarkable. That is the reality. In a prison, you have a situation where if you look at it. But the reality in the prison, according to this national report, is that this isn't done in any other prison, that this is really an aberrational policy. That's correct. But there's also no allegations in this complaint that having this type of policy is unconstitutional. By the way, opposing counsel is exactly right. The word search doesn't show up all over in Count 1, the 1983. It says all defendants. And so I think it's paragraph 66 that indicates that Oliver failed to respond. Is there any other place where there is to you understand the question I've got as to Defendant Oliver. Is there a particular interview that discusses what Oliver did when he responded? An interview? Right. The one prisoner interview that's incorporated into the complaint does not mention this. Is there another one? As far as I know, there's not. I'm not aware. Like counsel said, we haven't done discovery. All I know are the allegations in the complaint. Okay. And that does say that Lieutenant Oliver failed to ensure medical attention. However, there's no allegation that he delayed, interfered with, or enabled substandard care. In addition, their own complaint alleges that medical attention arrived within five minutes. It doesn't allege that Lieutenant Oliver was there before that. It does. Or at least a witness statement does indicate that he was there before that. That he was there before. Yeah. Anyway, I think you've answered my question. But in any case, it also doesn't allege that he had any medical training or ability to do anything. I think we have your argument. Thank you, Your Honor. Thank you. The case of Victor Perez v. James Gregg Cox is submitted.
judges: Ikuta, Christen, Morris